**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Tel.: (415) 772-4700
Fax: (415) 772-4707
lking@kaplanfox.com
mchoi@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (*pro hac vice* to be sought)
Hae Sung Nam (*pro hac vice* to be sought)
Frederic S. Fox (*pro hac vice* to be sought)
Donald R. Hall (*pro hac vice* to be sought)
Aaron L. Schwartz (*pro hac vice* to be sought)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7715
rkaplan@kaplanfox.com
hnam@kaplanfox.com
ffox@kaplanfox.com
dhall@kaplanfox.com
aschwartz@kaplanfox.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KONDOMAR HERRERA, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>     v.<br><br>GOOGLE LLC, a Delaware limited liability company,<br><br>                    Defendant. | Case No. 5:20-cv-07365<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

JURISDICTION AND VENUE ............................................................................................2

INTRADISTRICT ASSIGNMENT .......................................................................................2

PARTIES ................................................................................................................................2

FACTUAL ALLEGATIONS .................................................................................................3

GOOGLE MAINTAINS AN UNLAWFUL MONOPOLY IN THE ANDROID MOBILE APP DISTRIBUTION MARKET ............................................................................................3

    I.     The Android Mobile App Distribution Market is a Relevant Product Market .........3

    II.     The United States is the Relevant Geographic Market ..............................................4

    III.     Google has Monopoly Power in the Android Mobile App Distribution Market ......5

    IV.     Google has Engaged in Anticompetitive Conduct in the Android Mobile App Distribution Market Resulting in Anticompetitive Effects. .......................................8

        A.     Google's Anticompetitive Restraints on OEMs............................................8

        B.     Google has Imposed Anticompetitive Restraints on Mobile-App Developers ......................................................................................................9

ANTITRUST INJURY ........................................................................................................10

CLASS ACTION ALLEGATIONS .....................................................................................11

CLAIMS................................................................................................................................12

    Count 1: Unlawful Monopoly of the Android Mobile App Distribution Market in Violation of Sherman Act § 2 ....................................................................................... 12

    Count 2: Unlawful Restraints of Trade Concerning the Android Mobile App Distribution Market in Violation of Sherman Act § 1 ................................................. 14

    Count 3: Unreasonable Restraint of Trade in the Android Mobile App Distribution Market in Violation of the California Cartwright Act ................................................. 15

PRAYER FOR RELIEF.......................................................................................................16

JURY TRIAL DEMAND ....................................................................................................17

Plaintiff Kondomar Herrera ("Plaintiff"), on behalf of herself and all others similarly situated, brings this Class Action Complaint for damages and injunctive relief against defendant Google LLC ("Google") for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for violations of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et. seq.* All allegations other than those concerning the Plaintiff, are based on information and belief.

**INTRODUCTION**

1. In the United States, nearly 90 percent of a user's on-screen time on a mobile device is spent on a mobile app. Mobile apps are most often downloaded from an app store, which centralizes and curates the distribution of mobile apps in a convenient, user-friendly manner.

2. Google owns and operates the largest app store on earth, the Google Play Store. The Google Play Store is available to all mobile device users running Google's Android operating system ("OS"). The Google Play Store offers users the choice of more than 2.96 million apps, and, in 2019, users worldwide downloaded those apps more than 84.3 billion times.

3. To build this prodigious marketplace, Google represented that the Android OS would be maintained as "open" source software whereby anyone could create Android-compatible products without undue restrictions. But, as the app store grew and as Google's Android OS became the "must-have" operating software for mobile device original-equipment manufacturers ("OEMs"), Google began to close its ecosystem through a series of restrictive agreements that were designed to (and did in fact) deter and eliminate competition in the market for Android mobile apps and in-app products, ("the Android Mobile App Distribution Market").

4. Google's anticompetitive conduct, described below, allowed it to extract supracompetitive profits from consumers—like Plaintiff and Class Members—who paid Google directly for mobile apps purchased through the Google Play Store. Indeed, the Google Play Store contains more than 90 percent of Android mobile app downloads worldwide, which, through the 30 percent price Google extracts from Plaintiff and Class Members' mobile app and in-app purchases, helped Google to generate more than $21.5 billion in ill-gotten revenue.

5. Plaintiff and Class Members have also been harmed by Google's anticompetitive scheme because: (1) developers set higher app prices due to the high costs imposed on developers by Google; and (2) app quality has been reduced as app developers generated lower returns.

6. Plaintiff, on behalf of herself and the Class, seeks to recover the damages caused by Google's unlawful anticompetitive conduct and to obtain an order enjoining Google from continuing to engage in these unlawful practices.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over defendant Google because it is headquartered in this district and because it has sufficient minimum contacts with the United States to have purposefully availed itself of the benefits and protections of the United States and California law such that the exercise of jurisdiction over it would comport with due process requirements.

8. This Court has subject-matter jurisdiction over Plaintiff's federal antitrust claims pursuant to the Clayton Act § 16, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.

9. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because: (1) Google maintains its principal places of business in the State of California and in this district; and (2) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

11. In the alternative, personal jurisdiction and venue are proper under Clayton Act § 12, 15 U.S.C. § 22, because defendant is found in and transacts business in this district.

## INTRADISTRICT ASSIGNMENT

12. Assignment of this case to the San Jose Division is proper pursuant to Civil Local Rule 3-2(c)(e) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Santa Clara County, California.

## PARTIES

13. Plaintiff Kondomar Herrera is a natural person who resides in Queens County, New York. Plaintiff purchased and paid Google for one or more apps through the Google Play Store and

purchased and paid Google directly for in-app digital content through an app purchased on the Google Play Store within the last four years.

14. Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Way, Mountain View, California. Google LLC is a technology company that provides internet-related services and products. Since 2005, Google has owned and developed the Android OS for use in Android licensed mobile devices. Google LLC is also the owner of the Google Play Store from and by which developers of Android mobile apps sell their mobile app and in-app products to Android-operated mobile device owners.

**FACTUAL ALLEGATIONS**

**GOOGLE MAINTAINS AN UNLAWFUL MONOPOLY IN THE ANDROID MOBILE APP DISTRIBUTION MARKET**

**I.     The Android Mobile App Distribution Market is a Relevant Product Market**

15. A mobile app is a standardized piece of software that is optimized for use on a mobile device and provides access to digital content or services or otherwise allows users to share content, play games, or make transactions for physical or digital goods and services (an "in-app purchase").

16. While mobile apps may be pre-installed on a mobile device as a component of the OS by the OEM, or otherwise loaded directly onto the mobile device from the web using a web browser (a process that Google refers to as "sideloading"), the predominant way—by far—that consumers access mobile apps is through an app store, which itself may be pre-installed on the mobile device.

17. The app store is widely recognized as the starting point for accessing mobile apps, making it critical to the user experience, because it centralizes and curates the distribution of mobile apps in a convenient manner. Through an app store, a user may search, browse, find, review, buy, compare, and remove a mobile app. The app store may also offer mobile app developers' tools and services that support the building of mobile apps for that app store.

18. The rules governing an app store are typically set forth by the app store proprietor—here, Google—and concern things like: the types of mobile apps permitted in the app store; absence

of malware; how users pay for mobile apps; how revenue is distributed between the mobile app developer and the app store; and other such necessary details.

19. Because mobile apps are built in a specific programming language and configured to run on a specific type of mobile device OS as "native apps," distinct and separate product markets exist for mobile apps specific to the relevant OSs. For example, native apps developed for Apple iOS only work on Apple mobile devices and native apps developed for Android OS only work on Android mobile devices. Apple's App Store and the Google Play Store therefore do not compete against one another because Android users cannot utilize iOS apps or the Apple App Store, and iOS users utilize Android apps or the Google Play Store. So, Google's dominance of the Google Play Store is not constrained by Apple's App Store and vice versa.

20. Similarly, web sites and web apps are not competitively significant alternatives to the Android Mobile App Distribution Market. Mobile apps provide a deeper, richer user experience as compared to websites and web apps. For example, mobile apps can provide additional, unique functionalities by accessing specific features within the mobile device's hardware and operating system, such as a camera or location services. Moreover, websites and web apps rely on an internet connection, whereas mobile apps may continue to function even when the mobile device loses internet access. Because of these intrinsic benefits, users overwhelmingly choose to access content and services on their mobile devices through mobile apps—including for basic communication, business transactions, entertainment, and news—even though mobile devices users could access that content on their mobile devices via the internet. Indeed, in the United States, nearly 90 percent of user screen time on mobile devices is spent on mobile apps.

21. The Android Mobile App Distribution Market is therefore a relevant market that is comprised of all the channels by which mobile apps are distributed to Android OS users.

**II.     The United States is the Relevant Geographic Market**

22. The relevant geographic market for the Android Mobile App Distribution Market is the United States. App stores (and other app distribution channels) are broadly developed and distributed throughout the United States, as are the mobile apps contained within the app stores.

Indeed, the Google Play Store—and the apps downloaded through it—are available to Android users anywhere in the United States.

### III. Google has Monopoly Power in the Android Mobile App Distribution Market

23. The Google Play Store has more than 90 percent of all app store downloads in the Android Mobile App Distribution Market.

24. Google has designed the Android ecosystem to ensure that other sources of mobile apps for the Android OS are less desirable or of inferior quality. There are only three ways by which an Android phone user may access rival mobile apps: an app store may be pre-installed on the mobile device; a mobile app may be downloaded from another app store; or a mobile app may be sideloaded onto the mobile device. Google has thwarted meaningful user access for each.

25. First, Google has successfully demanded and reached agreements with mobile device OEMs that require the OEMs to pre-install and prominently display the Google Play Store on all mobile devices. Pre-installation is crucial because, as Google explains, "most users just use what comes on the device. People rarely change defaults."

26. Second, Google, as the proprietor of the Google Play Store, has exercised its monopoly power by refusing to allow any rival app stores to be accessed through the Google Play Store.

27. Thus, the only practical way for users to access a third-party app store is through sideloading. While Google theoretically permits sideloading third-party app stores, few users pursue this option because Google has implemented significant frictions designed to steer consumers away from sideloading. Sideloading a mobile app store has required users to go through a complicated multi-step process whereby users encounter multiple, unfounded security warnings that suggest sideloading was unsafe.

28. As explained by Epic, the maker of the popular mobile game *Fortnight*, in a recent lawsuit it filed against Google:

> Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process. For example, depending on the version of Android running on a mobile device, downloading and installing *Fortnite* on an Android device could take as many as 16 steps or more, including

requiring the user to make changes to the device's default settings and manually granting various permissions while being warned that doing so is dangerous.

29. And even where a rival app store is successfully sideloaded, Google attempts to thwart continued use of that app store by limiting some basic app functions that are available to apps downloaded on the Google Play Stare. For instance, apps downloaded through the Google Play Store are pre-set to automatically update in the mobile device's background. Meanwhile, as explained by Amazon on its website, updating an app on its Android app store requires a user to follow a multi-step process: "1. Open the app store you used to install the app on your device. 2. Search for the app and open the app's detail page. 3. If an update is available, an **Update** option displays." (emphasis in original). By making the app update process difficult, Google further discourages users from seeking out rival app stores and the apps offered therein.

30. By impeding (or interfering with) user access to third-party app stores, Google has ensured that it can extract supracompetitive prices for its Android app distribution services and in-app purchases made through the Google Play Store. Google has charged a 30 percent commission on sales of paid apps and a 30 percent fee for in-app purchases. Google collects and processes these commissions and fees directly from Plaintiff and Class Members, remitting the remainder of their payment to the mobile app developer. These commissions and fees generated more than $21.5 billion in global revenue for Google in 2018. If Google had operated the Google Play Store in a competitive market, free of Google's anticompetitive restraints, then the fees and commissions that Google could have collected from Plaintiff and Class Members would be significantly lower. Indeed, the commissions charged by alternative electronic payment processing tools—like PayPal and Square—are 2.9 percent and between 2.6 and 3.5 percent, respectively.

31. Google has abused and maintained its monopoly power in the Android Mobile App Distribution Market through restrictive, non-negotiable agreements with mobile app developers— who must choose between complying with Google's draconian terms of use or exit Google's ecosystem. To have a mobile app listed on the Google Play Store, mobile app developers must agree and have agreed with Google to *not* license their mobile app to any rival app stores. Indeed, Google's developer agreements mandate that developers may not "make available any Product that

has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." This has enabled Google to secure the most desired and highest quality mobile apps while simultaneously foreclosing access to mobile apps by rival app stores. Mobile app developers must acquiesce to Google's demand because leaving the Google Play Store to distribute software to Android users via sideloading or through third-party app stores causes precipitous declines in downloads and revenue.

32. Most other mobile app stores that exist in the Google ecosystem therefore serve niche products (for example, Samsung's Galaxy Store, which only offers apps related to Samsung-branded products) or otherwise must be sideloaded and have limited numbers of high-quality mobile apps. Aptoide, the second largest app store available to Android users only offers Plaintiff and Class Members approximately 700,000 apps, capturing only 1-2 percent of all Android mobile app downloads. Similarly, Amazon's Android app store only offers Plaintiff and Class Members approximately 487,000 apps, capturing less than 1 percent of all Android mobile downloads. Meanwhile, the Google Play Store offers Plaintiff and Class Members 2.56 million apps, including all the mobile apps most sought after by users, thereby enabling it to capture more than 90 percent of all Android mobile app downloads.

33. There are significant barriers to users switching mobile OSs. In 2018, Consumer Intelligence Research Partners reported that more than 90 percent of Android users who bought a new mobile device purchased a new Android mobile device.

34. Part of a user's lack of interest in switching is due to network effects. Google Android and Apple iOS have different operating concepts, user interface designs, and setting and configuration options. Users tend to pick one, learn it, invest in mobile apps and storage, and stick with it. Switching operating systems may entail the loss of compatibility with other smart devices designed to work in conjunction with the mobile device and its OS and the hassle of porting data from one OS to another. While mobile devices have a limited lifespan, and users might be expected to "break the lock-in cycle" when it is time to upgrade to a new device, users' reliance on software, data, and files, and other hardware and accessories that are only compatible with one product ecosystem, make it unlikely that they would switch to a non-compatible mobile device.

35. Based on the foregoing, there is abundant evidence that Google has monopoly power in the Android Mobile App Distribution Market.

**IV. Google has Engaged in Anticompetitive Conduct in the Android Mobile App Distribution Market Resulting in Anticompetitive Effects.**

36. Google has implemented a multi-prong anticompetitive scheme to establish and maintain its monopoly in the Android Mobile App Distribution Market and foreclose rival app store distribution channels. As a direct result of Google's anticompetitive scheme, it has charged supracompetitive prices for mobile app and in-app purchases.

**A. Google's Anticompetitive Restraints on OEMs**

37. Google has imposed and OEMs have agreed to anticompetitive covenants in Google's Mobile Application Distribution Agreement ("MADA"). This agreement, among other things, has required OEMs to:

- License the entire suite of Google applications and services (such as Google Play Services, Google Chrome, Gmail, Google Search, Google Maps, and YouTube) to license the Android OS;
- Pre-install the Google Play Store, as well as up to 30 other proprietary Google apps; and
- Place the Google Play Store on or near the main "home screen page" in its default configuration.

38. OEMs must agree and have agreed to Google's anticompetitive, restrictive terms and conditions or risk losing access to the Android OS. For example, in 2012 Acer partnered with Alibaba to release products on Alibaba's OS, Aliyun. When Google learned of this, it threatened to terminate its partnership with Acer. Acer subsequently abandoned its deal with Alibaba.

39. The restrictive MADA terms and conditions substantially limit the ability of rival app stores to meaningfully compete against Google in the Android Mobile App Distribution Market. By requiring pre-installation and prominent display of the Google Play Store, Google ensures that competing app stores are at a significant disadvantage the moment the user takes a mobile device out of the box. Google has acknowledged the competitive significance of pre-

installation, noting that "[p]reloading remains valuable to users, and hence device manufacturers, despite full unbundling because most users just use what comes on the device. People rarely change defaults."

40. For example, Epic, which makes the popular game *Fortnight*, tried to partner with LG, an Android-licensed OEM, to ease the restrictions by which users could download and play its game. But LG ultimately refused, informing Epic that its contract with Google required LG "to block side downloading off Google Play Store *this year*." (emphasis added).

41. Google's restrictive MADA agreements have therefore foreclosed meaningful competition in the Android Mobile App Distribution Market, allowing Google to charge supracompetitive prices for mobile app and in-app purchases. The anticompetitive MADA agreements have also harmed Plaintiff and Class Members by limiting consumer choice. Absent Google's unlawful restraints of trade, OEMs would be free to negotiate with third-party app stores for prominent placement on the OEMs' mobile device home screens. Third-party app stores could then attract prominent app developers to their store. Plaintiff and Class Members would benefit from such competition through added choices and lowered costs for mobile apps and in-app purchases.

**B.      Google has Imposed Anticompetitive Restraints on Mobile-App Developers**

42. Through its Google Play Developer Distribution Agreement ("DDA"), Google has imposed anticompetitive contractual restrictions on app developers to foreclose meaningful competition in the Android Mobile App Distribution Market, thereby ensuring rival app stores lack access to high-quality, in-demand mobile apps. Indeed, Google has refused to negotiate any provision of the DDA and has required all mobile-app developers to sign the DDA before Google will list their mobile app on the Google Play Store.

43. The restrictive provisions in the DDA include:
- Section 4.1, which has mandated compliance with Google's Developer Program Policies. These Policies have required, among other things, that mobile device app developers use Google's proprietary in-app billing for in-app game payments, as well as certain other digital in-app purchases;

- Section 4.5, which has mandated that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play"; and

- Section 8.3, which has broadly granted Google the right to remove any Android app it believes has violated any portion of the DDA.

44. Mobile-app developers seeking access to Android users through the Google Play Store have had no choice but to accept Google's demands or suffer precipitous declines in downloads and revenue due to a lack of access to the Google Play Store. Indeed, removal from the Google Play Store could mean that basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play Store, may be disrupted. Meanwhile, updating an app downloaded through a rival app store requires users to follow a multi-step, manual process each time an update is made available. The DDA thus enables Google to secure the most desired and highest quality mobile apps for itself while simultaneously foreclosing access by rival app stores.

45. As the sole proprietor of the Google Play Store, Google has exercised its gatekeeping power to constrain competition and foreclose rival access. Numerous market participants have complained to Congressional staffers that Google uses arbitrary rule violations of various Google Play Store policies as a pretext for retaliatory conduct and to foreclose competition.

46. In the absence of these unlawful restraints, high-quality mobile-app developers would be incentivized to offer their mobile apps on as many app stores as possible, expanding their exposure to users, generating additional downloads and revenue, and reducing the price that Plaintiff and Class Members pay for mobile apps and in-app purchases.

## ANTITRUST INJURY

47. Plaintiff and Class Members have suffered antitrust injury as a direct result of Google's unlawful conduct.

48. Plaintiff and Class Members have purchased Android mobile apps and in-app digital content directly from Google through the Google Play Store.

49. As described above, Google's restrictive contracts and anticompetitive practices have foreclosed competition in the Android Mobile App Distribution Market and enabled Google to charge Plaintiff and Class Members supracompetitive prices for mobile app and in-app purchases.

## CLASS ACTION ALLEGATIONS

50. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and on behalf of the following class (the "Class"):

> All persons in the United States who, within the relevant statute of limitations (the "Class Period"): (1) paid for a mobile app on the Google Play Store; (2) paid subscription fees for a mobile app obtained on the Google Play Store; or (3) purchased in-app digital content from a mobile app that was downloaded at the Google Play Store.

51. Excluded from the Class are the Court, Defendant and its parent, subsidiary, and affiliated entities, and their officers, directors, employees, affiliates, legal representatives, predecessors, successors, and assigns.

52. Class Members are so numerous that joinder of all members is impracticable. Indeed, due to the nature of the trade and commerce involved, there are, perhaps, tens of millions of geographically dispersed Class Members, the exact number and identities of whom are known exclusively to defendant.

53. Common questions of law and fact exist as to all Class Members and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class include:

   a. Whether Google has monopoly power in the Android Mobile App Distribution Market;

   b. Whether Google's contractual restrictions with OEMs furthered Google's monopolization of the Android Mobile App Distribution Market;

   c. Whether Google's contractual restrictions with mobile app developers furthered Google's monopolization of the Android Mobile App Distribution Market;

  d. Whether Google's conduct resulted in supracompetitive prices for Android mobile apps;

  e. Whether Google's conduct resulted in supracompetitive prices for in-app digital content purchases;

  f. Whether Google's conduct has been detrimental to Plaintiff and Class Members; and

  g. The appropriate Class-wide measure of damages.

54. Plaintiff's claims are typical of the claims of the Class, as all Class Members were similarly affected by Google's common course of wrongful conduct in violation of federal and state law, as complained of herein. Moreover, the damages and injuries of Plaintiff and Class Members were directly caused by Google's wrongful conduct.

55. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel that is competent and experienced in class-action litigation. Plaintiff has no interests that conflict with (or is otherwise antagonistic to) the interests of other Class Members.

56. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

## CLAIMS

### Count 1: Unlawful Monopoly of the Android Mobile App Distribution Market in Violation of Sherman Act § 2

57. Plaintiff hereby incorporates all other paragraphs as if fully stated here.

58. Google's conduct has violated Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2.

59. The Android Mobile App Distribution Market in the United States is a valid antitrust market.

60. Google has held monopoly power in the Android Mobile App Distribution Market.

61. Google has unlawfully acquired and maintained monopoly power in the Android Mobile App Distribution Market through the anticompetitive acts described in this Complaint, including, but not limited to: (1) leveraging its Android OS and Google suite of products to impose anticompetitive contractual restrictions in its agreements with OEMs; (2) requiring OEMs to pre-install and prominently display the Google Play Store on the "home screen" of each mobile device; (3) requiring app developers to sign the Google Play DDA before any app is made available for download on the Google Play Store, which DDA has mandated that app developers (a) "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play" and (b) must use Google's proprietary in-app billing for certain in-app purchases; and (4) blocking mobile apps offered outside the Google Play Store "from offering basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play Store."

62. Google's conduct has had no legitimate pro-competitive justification considering its anticompetitive effects, and therefore it has unreasonably restrained competition in the Android Mobile App Distribution Market.

63. Google's conduct has affected a substantial volume of interstate commerce.

64. Google's conduct has had substantial anticompetitive effects, including increased prices and costs for mobile apps and in-app products charged to Plaintiff and Class Members.

65. Plaintiff and Class Members have been injured and damaged by Google's anticompetitive conduct as Plaintiff and Class Members have been forced to pay supracompetitive prices for mobile app and in-app purchases.

66. Plaintiff and Class Members have been further deprived of the ability to choose between mobile apps and in-app products on the Google Play Store or lower-cost third-party app stores that would have been available had Google not engaged in the misconduct alleged here.

67. Plaintiff and Class Members have suffered and continue to suffer damages and irreparable injury. Such damages and irreparable injury will not cease until and unless this Court issues an injunction terminating Google's anticompetitive conduct.

**Count 2: Unlawful Restraints of Trade Concerning the Android Mobile App Distribution Market in Violation of Sherman Act § 1**

68. Plaintiff hereby incorporates all other paragraphs as if fully stated here.

69. Google's conduct has violated §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

70. The Android Mobile App Distribution Market in the United States is a valid antitrust market.

71. As alleged herein, Google entered into anticompetitive agreements with third parties that have unreasonably restricted competition in the Android Mobile App Distribution Market.

72. These agreements include the MADA agreements Google entered into with OEMs that condition access to Android OS on: (1) licensing the entire suite of Google applications and services (such as Google Play Services, Google Chrome, Gmail, Google Search, Google Maps, and YouTube); (2) pre-installing the Google Play Store, as well as up to 30 other proprietary Google apps; and (3) prominently displaying the Google Play Store on or near the main "home screen page" as the default configuration.

73. These agreements also include the DDA agreements Google entered with mobile-app developers that, as a condition of having their app listed on the Google Play Store, required mobile-app developers to: (1) "not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play"; and (2) use Google's proprietary in-app billing for certain in-app purchases.

74. These agreements have had no legitimate pro-competitive justification considering their anticompetitive effects and have therefore unreasonably restrained competition in the Android Mobile App Distribution Market.

75. Google's conduct has affected a substantial volume of interstate commerce.

76. Google's conduct has had substantial anticompetitive effects, including increased prices and costs for mobile apps and in-app products charged to Plaintiff and Class Members.

77. Plaintiff and Class Members have been injured and damaged by Google's anticompetitive conduct as Plaintiff and Class Members have been forced to pay supracompetitive prices for mobile app and in-app purchases.

78. Plaintiff and Class Members have been further deprived of the ability to choose between mobile apps and in-app products on the Google Play Store or lower-cost third-party app stores that would have been available had Google not engaged in the misconduct alleged here.

79. Plaintiff and Class Members have suffered and continue to suffer damages and irreparable injury. Such damages and irreparable injury will not cease until and unless this Court issues an injunction terminating Google's anticompetitive conduct.

**Count 3: Unreasonable Restraint of Trade in the Android Mobile App Distribution Market in Violation of the California Cartwright Act**

80. Plaintiff hereby incorporates all other paragraphs as if fully stated here.

81. Google's acts and practices detailed above have violated the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

82. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

83. The Android Mobile App Distribution Market is a valid antitrust market.

84. As alleged herein, Google has entered into agreements with third parties that have unreasonably restricted competition in the Android Mobile App Distribution Market.

85. These agreements include the MADA agreements Google entered into with OEMs that condition access to Android OS on: (1) licensing the entire suite of Google applications and services (such as Google Play Services, Google Chrome, Gmail, Google Search, Google Maps, and

YouTube); (2) pre-installing the Google Play Store, as well as up to 30 other proprietary Google apps; and (3) prominently displaying the Google Play Store on or near the main "home screen page" as the default configuration.

86. These agreements also include the DDA agreements Google entered with mobile app developers that, as a condition of having their app listed on the Google Play Store, required mobile app developers to: (1) "not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play"; and (2) use Google's proprietary in-app billing for certain in-app purchases.

87. Google's conduct has had substantial anticompetitive effects, including increased prices and costs for mobile apps and in-app products charged to Plaintiff and Class Members.

88. Plaintiff and Class Members have been injured and damaged by Google's anticompetitive conduct as Plaintiff and Class Members have been forced to pay supracompetitive prices for mobile app and in-app purchases.

89. Plaintiff and Class Members have been further deprived of the ability to choose between mobile apps and in-app products on the Google Play Store or lower-cost third-party app stores that would have been available had Google not engaged in the misconduct alleged here.

90. It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

91. Plaintiff and Class Members have suffered and continue to suffer damages and irreparable injury. Such damages and irreparable injury will not cease until and unless this Court issues an injunction terminating Google's anticompetitive conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Permanently enjoin defendant from monopolizing the Android Mobile App Distribution Market;

B. Permanently enjoin defendant from engaging in anticompetitive conduct in connection with its agreements with OEMs and app developers;

C. Award Plaintiff and Class Members treble damages for injuries caused by defendants' unlawful conduct in violation of federal and state antitrust laws;

D. Award Plaintiff and the Class their reasonable attorneys' fees and costs; and

E. Grant Plaintiff such further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.

DATED: October 20, 2020

**KAPLAN FOX & KILSHEIMER LLP**

/s/ *Laurence D. King*
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Tel.: (415) 772-4700
Fax: (415) 772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

Robert N. Kaplan (*pro hac vice* to be sought)
Hae Sung Nam (*pro hac vice* to be sought)
Frederic S. Fox (*pro hac vice* to be sought)
Donald R. Hall (*pro hac vice* to be sought)
Aaron L. Schwartz (*pro hac vice* to be sought)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7715
*rkaplan@kaplanfox.com*
*hnam@kaplanfox.com*
*ffox@kaplanfox.com*
*dhall@kaplanfox.com*
*aschwartz@kaplanfox.com*

*Attorneys for Plaintiff and the Proposed Class*